1

2

3

4

5

6

7

8           UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON
9                     AT TACOMA

10   BARRY CHRISTIANSON; the Rev. ALVIN
    FISCHER; the Rev. MARK GALLAGHER;
11   JUANITA GREENWAY; HELEN HEWITT;
    JORDIS I. JENSEN; JON JORDENS; PAUL         Case No. C06-5520 FDB
12   KING; NANCY MCCARTER; RALPH K.
    OLSON; BEVERLY SCHWARTZ; WILLIAM            ORDER DENYING PRELIMINARY
13   HUGH SHUFORD; and PAUL L. WHITING,         INJUNCTION AND DISMISSING
                                                ACTION
14           Plaintiffs,

15        v.

16   MICHAEL O. LEAVITT, Secretary of Health
    and Human Services, in his official capacity,
17   and in his individual capacity; INSTITUTE
    FOR YOUTH DEVELOPMENT; and
18   NORTHWEST MARRIAGE INSTITUTE,

19           Defendants.

20

21
         This lawsuit, filed on behalf of thirteen Washington taxpayers, alleges that federal grants
22
    made to the Northwest Marriage Institute have been used to finance religious activities in violation of
23
    the Constitution's Establishment Clause.  Before the Court are Plaintiffs' motion for preliminary
24
    injunction and the motions to dismiss of Defendants Northwest Marriage Institute and Institute for
25

26   ORDER - 1

1   Youth Development[1], and motion for summary judgment of Defendant Secretary of Health and

2   Human Services.  Plaintiffs seek an order enjoining the Department of Health and Human Services

3   and the Institute for Youth Development from disbursing any additional grant monies to the

4   Northwest Marriage Institute and enjoining the Northwest Marriage Institute from spending or

5   otherwise using any additional grant monies that it has already received or may receive in the future

6   pending the resolution of this lawsuit.

7          The Court, after having reviewed all materials submitted by the parties and relied upon for

8   authority, is fully informed and hereby denies the request for preliminary injunction and grants the

9   Defendants' motions to dismiss.

10                          **INTRODUCTION AND BACKGROUND**

11         Grants under the Compassion Capital Fund (CCF) are awarded under Section 1110 of the

12  Social Security Act, which authorizes "demonstration projects."  42 U.S.C. §1310.  This program

13  was created in 2002 to help build capacity and knowledge among faith-based and community-based

14  organizations and encourage the replication of effective approaches and programs to better meet the

15  needs of poor and low-income individuals and families.  The program is funded through annual

16  appropriations.  CCF is administered by the Administration for Children and Families within the

17  Department of Health and Human Services.  CCF provides demonstration program grants to

18  intermediary organizations, such as  that the Institute for Youth Development**,** that provide capacity-

19  building sub-grants to faith-based and other community organizations.  Capacity-building activities

20  are designed to increase an organization's sustainability and effectiveness, enhance its ability to

21  provide social services, diversify its funding sources, and create collaborations to better serve those

22  in need.  CCF also provides one-time targeted capacity building program grants directly to faith-

23

24         [1]A motion to dismiss made under Rule 12(b)(6) must be treated as a motion for summary
    judgment if either party submits materials outside the pleading and the court relies on those materials.
25  Therefore, the Court will treat the motions to dismiss as motions for summary judgment.

26  ORDER - 2

1  based and community-based organizations to help build the capacity of such organizations that

2  address the needs of distressed communities.

3      The Department of Labor, Health and Human Services regulations expressly and specifically

4  prohibits using CCF funds to support religious practices, such as religious instruction, worship or

5  prayer.  Organizations that receive CCF funds may not engage in inherently religious activities, such

6  as worship, religious instruction, or proselytization, as part of the programs or services funded with

7  CCF funds.  Any religious activities conducted by an organization receiving CCF funds must be

8  offered separately, in time or location, from the programs or services funded with CCF assistance,

9  and participation must be voluntary for beneficiaries of the CCF-funded programs or services.  See,

10 67 Fed. Reg. 39,563; 70 Fed. Reg. 22,331,  22,341 (Apr. 29, 2005).

11     A separate program, the Healthy Marriage Demonstration Grant program, is authorized

12 under Section 603(a)(2) of the Social Security Act.  The program funds "healthy marriage promotion

13 activities," including "[m]arriage education, marriage skills, and relationship skills programs" and

14 "[p]re-marital education and marriage skills training for engaged couples and for couples or

15 individuals interested in marriage."  42 U.S.C. §603(a)(2)(A)(iii).

16     Regulations prohibit the use of Healthy Marriage Demonstration Grant funds for "inherently

17 religious activities, such as worship, religious instruction, or proselytization, as part of the programs

18 or services funded with direct financial assistance from the Department of Labor, Health and Human

19 Services.  45 C.F.R. §87.1©).

20     Dr. Robert Whiddon, Jr.,  is the founder and director of the Northwest Marriage Institute.

21 Dr. Whiddon earned his Ph.D. in Biblical Counseling in 1996 at Trinity Theological Seminary,

22 Indiana.   He is a licensed clinical pastoral counselor and has twenty-five years experience in ministry

23 and counseling.  He is a registered counselor in the State of Washington.

24     The Northwest Marriage Institute, based in the Pacific Northwest, was loosely organized in

25 June of 2004, to provide biblical marriage counseling.  On September 13, 2004, the Northwest

26 ORDER - 3

1  Marriage Institute was recognized as a tax-exempt non-profit. The Marriage Institute's mission

2  statement provides: "The Northwest marriage Institute exists to serve the community by providing

3  Bible education in marriage and related subjects, and to provide professional, Bible-based pre-marital

4  and marriage counseling.  We believe that every problem can be resolved and every troubled

5  marriage can be saved.  To this end we will promote successful biblical principles for every day life.

6  The Northwest Marriage Institute is a non-profit service available to all people regardless of their

7  beliefs."

8       The Institute provided six to eight workshops based on biblical principles beginning in

9  January 2005 and ending in April 2006.  The Institute started a monthly newsletter with religious

10  content, entitled Marriage Works!, in January 2005.  A web site was launched in early 2006 that also

11  contained religious content.

12       According to the deposition testimony of Dr. Whiddon, beginning in April 2005 and

13  culminating in the formal change in its mission statement in October 2006, The Marriage Institute

14  shifted its mission from providing Bible-based marriage workshops and counseling to providing

15  marriage workshops without religious references.  This change was prompted by a desire to qualify

16  for operational funding from the federal government.  The Marriage Institute conducted its last

17  Bible-based workshop in April 2006 and is no longer offering Bible-based workshops.  The Marriage

18  Institute has conducted two secular marriage workshops from August 2006 to January 2007.  Dr.

19  Whiddon states that the curriculum for the workshops is based on secular psychological and

20  sociological principles, studies, and writings that Dr. Whiddon has encountered over the years.  Dr.

21  Whiddon reworked his Bible-based written curriculum materials by rewriting the first two lessons,

22  adding chapters on domestic violence and marital affairs, and deleted all religious references

23  throughout the remaining materials.  The curriculum includes the notice that "[b]ecause this project

24  is made possible because of federal grant funds, there will be no religious content included in the

25  written materials or workshop presentations.  Any questions or discussions regarding religious

26  ORDER - 4

1   aspects of marriage must be addressed in a separate place or at a separate time than the scheduled

2   workshop sessions.  Please respect [this] arrangement."

3         The first federal grant awarded the Northwest Marriage Institute in June 2005 was for

4   $47,750. through the Institute for Youth Development.  These funds were awarded for targeting

5   capacity building.  The funds were expended for the purchase of a computer, computer workstation,

6   printer, copier, LCD projector, and public address system.  The Institute also purchased accounting

7   software and hired a financial consultant to perform an audit and train an employee on use of the

8   accounting software.  None of these funds were used for any workshops and nothing purchased with

9   these funds was ever used in Bible-based workshops.

10        The second grant, a targeted capacity building grant of $50,000. awarded in September, 2005

11   through the CCF, was used for staff salaries, computer software and a web consultant.  Again, Dr.

12   Whiddon states that no funds from this grant were used for any workshops, and nothing purchased

13   was used in a religious workshop.  As to both the capacity-building grants, Dr. Whiddon testifies that

14   receipt of these funds did not free up other funds to permit the Institute to provide religious

15   workshops.

16        The current grant, a Healthy Marriage Demonstration grant of $246,728., has been used to

17   pay staff salaries, rent office space and accommodations for marriage workshops, purchase

18   advertising, prepare curriculum materials, and purchase additional computer equipment.  Dr.

19   Whiddon again testifies that none of these funds has ever been used for religious-based workshops.

20        The marriage Institute tracks its use of federal grant funds and privately donated funds,

21   respectively.

22        The Marriage Institute continues to produce the Marriage Works! Newsletter.  The

23   newsletter includes religious content, however Dr. Whiddon testifies it is produced on his personal

24   computer at home rather than any computer purchased with federal grant monies.  Only private

25   donations and private equipment are used to print, copy, and distribute the newsletter.  A separate,

26   ORDER - 5

1   secular content newsletter is provided to participants in the secular workshops.

2       The Institute's web site was revised in 2006 to eliminate religious content in order that it

3   could be used as a reference for the secular workshops.  No federal funds were used to maintain this

4   web site or to produce its content.

5                    **REQUIREMENTS FOR A PRELIMINARY INJUNCTION**

6       To obtain a preliminary injunction, the moving party must establish either: (1) a combination

7   of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions

8   regarding the merits exist and the balance of hardships tips in the moving party's favor.  See,

9   Warsoldier v. Woodford, 418 F.3d 989, 993-94 (9th Cir. 2005); Rodeo Collection, Ltd. v. West

10  Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987).  These two alternatives represent extremes of a single

11  continuum, rather than two separate tests.  Warsoldier, at 994.  They represent two points on a

12  sliding scale in which the required degree of irreparable harm increases as the probability of success

13  decreases.  Baby Tam & Co. v. City of Las Vegas, 154 F.3d 1097, 1100 (9th Cir. 1998).

14                         **SUMMARY JUDGMENT STANDARD**

15      The purpose of summary judgment is to identify and dispose of factually unsupported claims

16  and defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary

17  judgment, the court is constrained to draw all inferences from the admissible evidence in the light

18  most favorable to the non-moving party.  Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir.

19  2000).  Summary judgment is appropriate where there is no genuine issue of material fact and the

20  moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©).  The moving party

21  bears the initial burden to demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

22  v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the opposing party

23  must show that there is a genuine issue of fact for trial.  Matsushita Elect. Indus. Co. v. Zenith Radio

24  Corp., 475 U.S. 574, 586-87 (1986).  A dispute as to a material fact is "genuine" if there is sufficient

25  evidence for a reasonable jury to return a verdict for the nonmoving party.  Anderson v. Liberty

26  ORDER - 6

1 Lobby, Inc., 477 U.S. 242, 248 (1986).  The opposing party must present significant and probative

2 evidence to support its claim or defense.  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d

3 1551, 1558 (9th Cir. 1991).  Affidavits made on personal knowledge and setting forth facts as would

4 be admissible at trial are evidence that a court may consider when determining whether a material

5 issue of fact exists. Fed. R. Civ. P. 56(e).  Legal memoranda and oral argument are not evidence and

6 do not create issues of fact. See British Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978).

7 Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material

8 fact.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002); T.W. Elec. Serv. v.

9 Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.1987).  The nonmoving party must instead

10 set forth "significant probative evidence" in support.  T.W. Elec. Serv., at 630.  Summary judgment

11 will thus be granted against a party who fails to demonstrate facts sufficient to establish an element

12 essential to his case when that party will ultimately bear the burden of proof at trial.

13 **ESTABLISHMENT CLAUSE**

14 The Establishment Clause provides simply that "Congress shall make no law respecting an

15 establishment of religion."  U.S. Const. amend. I..  The Establishment Clause prevents the

16 government from promoting any religious doctrine or organization or affiliating itself with one.

17 County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 589 (1989).  It "is a specific

18 prohibition on forms of state intervention in religious affairs." Lee v. Weisman, 505 U.S. 577, 591

19 (1992).  One of the few absolutes in Establishment Clause jurisprudence is the "prohibit[ion against]

20 government-financed or government-sponsored indoctrination into the beliefs of a particular religious

21 faith." Bowen v. Kendrick, 487 U.S. 589, 611 (1988).  The greatest risk of impermissibly advancing

22 religion occurs when the government makes direct money payments to sectarian institutions.

23 Rosenberger v. Rector and Visitors of University of Virginia, 515 U.S. 819, 842 (1995).

24 The Supreme Court has noted, however, that it has never held that religious institutions are

25 disabled by the First Amendment from participating in publicly sponsored social welfare programs.

26 ORDER - 7

1  Bowen, at 609.  The Supreme Court has consistently rejected the argument that any and all

2  government aid to a religiously affiliated institution violates the Establishment Clause. See Agostini v.

3  Felton, 521 U.S. 203, 225 (1997); Mueller v. Allen, 463 U.S. 388, 393 (1983).  What the

4  Establishment Clause prohibits is not aid to all sectarian institutions, but aid to an "institution in which

5  religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission

6  or when it funds a specifically religious activity in an otherwise substantially secular setting." Hunt v.

7  McNair, 413 U.S. 734, 743 (1973).   The Establishment Clause requires: (1) that no state aid at all

8  go to institutions that are so pervasively sectarian that secular activities cannot be separated from

9  sectarian ones, and (2) that if secular activities can be separated out, they alone may be funded.

10  Roemer v. Bd. of Public Works of Md., 426 U.S. 736, 775 (plurality opinion)(1976).

11       Although the Supreme Court continues to struggle with Establishment Clause jurisprudence

12  and has rendered a number of fragmented Court decisions over the past decade, the principles set

13  forth in Lemon v. Kurtzman, 403 U.S. 602 (1971) continue to guide the inquiry.  See, Community

14  House, Inc. v. City of Boise, Idaho, 468 F.3d 1118, 1129 nt.8 (9th Cir. 2006); DeStefano v.

15  Emergency Housing Group, Inc., 247 F.3d 397, 405 (2nd Cir. 2001).  Under the Lemon test,

16  government action is permissible for purposes of Establishment Clause analysis only if (1) it has a

17  secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it

18  does not foster an excessive entanglement with religion.  Lemon, at 612-13; Community House, Inc.,

19  at 1129-30.

20       In Agostini v. Felton, 521 U.S. 203, 222-23, 234 (1997), the Supreme Court refined the

21  Lemon test by folding the "excessive entanglement" inquiry into the "effect" prong. See Mitchell v.

22  Helms, 530 U.S. 793, 807-08 (2000) (Thomas, J., plurality); Mitchell, at 844-45 (O'Connor, J.,

23  concurring); Community House, at 1130.  Thus, under the Lemon-Agostini test, the Court must ask

24  (1) "whether the government acted with the purpose of advancing or inhibiting religion," and (2)

25  "whether the [governmental] aid has the 'effect' of advancing or inhibiting religion." Agostini, at

26  ORDER - 8

1    222-23; Community House, at 1130.

2          Three primary criteria are used for evaluating whether government aid has the "effect" of

3    advancing or endorsing religion: (1) whether governmental aid results in government indoctrination;

4    (2) whether recipients of the aid are defined by reference to religion; and (3) whether the aid creates

5    excessive government entanglement with religion. See Agostini, at 234-35; see also Mitchell, at 808

6    (Thomas, J., plurality); Mitchell, at 845 (O'Connor, J., concurring); Community House, at 1130.

7          A.    Secular Purpose

8          There is no plausible dispute that the grant programs have a valid secular purpose of the

9    promotion of healthy marriages and capacity-building in organizations providing social welfare

10   services.  The first part of the Lemon- Agnostini test is therefore not in question and need not be

11   discussed.

12         B.    Primary Effect

13         An absolute in Establishment Clause jurisprudence is the prohibition against

14   government-financed or government-sponsored indoctrination into the beliefs of a particular religious

15   faith.  Bowen v. Kendrick, 487 U.S. 589, 611 (1988). See also Agostini v. Felton, 521 U.S. 203, 223

16   (1997)(Government inculcation of religious beliefs has the impermissible effect of advancing religion);

17   Levitt v. Committee for Pub. Educ. & Religious Liberty, 413 U.S. 472, 480 (1973)(The State is

18   constitutionally compelled to assure that the state-supported activity is not being used for religious

19   indoctrination); Zorach v. Clauson, 343 U.S. 306, 314 (1952)(The government may not undertake

20   religious instruction).

21         To determine whether particular grants of aid to particular institutions do not have the primary

22   effect of advancing religion, the court considers (1) whether the institutions receiving the aid are

23   pervasively sectarian[2] and/or (2) whether the aid is used to fund specifically religious activities.

24   _____

25         [2]The continued vitality of the "pervasively sectarian" test has come into question after Justice
     Thomas commented in the plurality opinion in Mitchell v. Helms, 530 U.S. 793, 829 (2000)
26   ORDER - 9

1    Bowen, 487 U.S. at 621; Roemer v. Bd. of Public Works of Md., 426 U.S. 736, 775 (1976); Hunt v.

2    McNair, 413 U.S. 734, 743 (1973).

3         In moving for a preliminary injunction against the award of grant monies to the Marriage

4    Institute, Plaintiffs assert that the subject grants (1) constitute unconstitutional aid to a persuasively

5    sectarian institution,(2)support religious activity, (3) convey a message of endorsement of religion, (4)

6    unlawfully supplant the private funding of religious activity, (5) constitute divertable and unmonitored

7    grants to a religious organization, and (6) require monitoring that would excessively entangle the

8    government with religion.

9         Plaintiffs assert that the Northwest Marriage Institute is pervasively sectarian and any federal

10   aid is unconstitutional.  An institution is pervasively sectarian if a "substantial portion of its functions

11   are subsumed in the religious mission." Bowen 487 U.S. at 610.  No state aid at all can go to

12   institutions that are so 'pervasively sectarian' that secular activities cannot be separated from sectarian

13   ones, and if secular activities can be separated out, they alone must be funded  Roemer, 426 U.S. at

14   755.  Funding of a sectarian institution is not forbidden when the inherently religious nature of the

15   institution can be separated from its secular work.  Bowen, 487 U.S. at 621; Hunt v. McNair, 413

16   U.S. 734, 743 (1973).  A religious motivation on behalf of a sectarian institution in providing secular

17   services does not transform the secular services into religious activity.  Bowen, 487 U.S. at 613.  The

18   pervasively sectarian inquiry does not consider the theological beliefs or dogmas cherished by the

19   institution in question.  Instead, the inquiry looks at the recognizable factors that indicate whether, in

20   practice, aid  flows to an institution in which religion is so pervasive that a substantial portion of its

21   functions are subsumed in the religious mission or when it funds a specifically religious activity in an

22   _____

23   (Thomas, J., plurality) that "nothing in the Establishment Clause requires the exclusion of pervasively
     sectarian schools from otherwise permissible aid programs, and other doctrines of this court bar it."

24   The plurality, however, is not a majority and the test was not expressly rejected by the full Court.
     This Court remains bound by Supreme Court precedent that has not been overruled.  See, Agostini

25   v. Felton, 521 U.S. 203, 237 (1997);  Steele v. Indust. Dev. Bd. of Metro. Gov't Nashville, 301 F.3d
     401, 408-09 (6th Cir. 2002)

26   ORDER - 10

1   otherwise substantially secular setting.  <u>Hunt</u>, 413 U.S. at 743.

2           Were this Court concerned solely with the Institute's initial Bible-based marriage counseling,

3   it would have no difficulty in finding a violation of the Establishment Clause.  Without question, prior

4   to the change in mission and award of the federal grants, the Institute was pervasively sectarian.

5   Faith-based marriage workshops and counseling premised on the words of the Bible is a specifically

6   religious form of marriage counseling/education.  The Bible-based model of marriage education

7   employed by the Marriage Institute makes it impossible to make a distinction between secular and

8   sectarian aspects of its marriage counseling.  The pre-grant Institute is a pervasively sectarian

9   organization. See <u>Americans United For Separation of Church and State v. Prison Fellowship</u>

10  <u>Ministries</u>, 432 F. Supp.2d 862, 920-21 (S.D. Iowa, 2006)(Pre-release rehabilitation program,

11  conducted in state prison by private organization receiving funding from state, was pervasively

12  sectarian in nature, in violation of Establishment Clause, when all instruction was presented as aspect

13  of Evangelical Christianity, and participants were required to participate in devotional activities.)

14          However, the Court is not concerned with the pre-grant programs of the Institute.  The

15  Institute altered its mission and no longer offers Bible-based marriage workshops.  A religious

16  motivation of behalf of a sectarian institution in providing secular services dose not transform the

17  secular services into religious activity

18          Plaintiffs' contend that the Institute was offering only religion-based workshops when it

19  received the first two grants and thus, the grants supported religion.  This argument misconstrues the

20  facts.  The two initial grants were directed specifically to capacity building.  Capacity-building grants

21  are designed to increase an organizations effectiveness and enhance its ability to provide social

22  services.  According to the testimony of Dr. Whiddon, these grant funds were used in the capacity-

23  building activity of preparing the Institute to provide the secular workshops.  Plaintiffs have not

24  provided credible contradictory evidence.

25          Plaintiffs assert that the Institute's grant-funded secular workshop curriculum is no more than

26  ORDER - 11

1    the religious curriculum, without reference to religion.  Specifically, Plaintiffs claim that the new

2    workshop materials are a study presenting Bible-based messages without mention of the Bible, and

3    thus, are in actuality, religiously based.  The Court is not persuaded by this argument.  Without

4    reference to religion (God and the Bible), the Institute's  curriculum cannot be considered sectarian.

5    Otherwise, tenets of a healthy marriage, such as avoiding extra-marital affairs, could be considered

6    religiously based simply because the same admonition is contained in the Bible.  A program does not

7    violate the Establishment Clause because it happens to coincide or harmonize with the tenets of some

8    or all religions.  See Hernandez v. Commissioner, 490 U.S. 680, 696 (1989); Bowen v. Kendrick, 487

9    U.S. 589, 612 (1988); McGowan v. Maryland, 366 U.S. 420, 442 (1961).

10       Plaintiffs also contend that if not direct aid of religion, the grants have the effect of advancing

11    religion through governmental indoctrination.  See Agostini, 521 U.S. at 234.  To satisfy this

12    criterion, Plaintiffs must show (1) that public funding of the marriage workshops and capacity-

13    building constitutes or results in indoctrination, and (2) that such indoctrination is attributable to the

14    government. Id., at 226;  Community House, 468 F.3d at 1131.   To 'indoctrinate' means to instruct

15    in a body of doctrine or principles, to imbue with a partisan or ideological point of view.  Community

16    House, at 1131.  Indoctrination  is used synonymously with 'inculcation.'  To 'inculcate' is to impress

17    something upon the mind of another by frequent instruction or repetition; to instill.  See, Agostini,

18    521 U.S. at 223- 24; Bowen, 487 U.S. at 621; Lemon, 403 U.S. at 619.

19       Plaintiffs' assert that the Institute's use of the words "Every Marriage Saved!" on its logo

20    covey a religious message.  The logo depicts an ambulance and the afore-mentioned phrase, all

21    enclosed by a circle.  In this context the word "saved" is more likely to convey a medical emergency

22    connotation than a religious one, such as rescuing a marriage from injury.

23       Plaintiffs also assert that religion continues to appear in the Institute's newsletter.  This

24    allegation belies the testimony that no federal funds are expended in the composition, printing and

25    distribution of the newsletter.  The fact that a sectarian organization continues with separate religious

26    ORDER - 12

1  activities after receiving grant monies for sectarian endeavors does not constitute a violation of the

2  Establishment Clause.  See Bowen, 487 U.S. at 621; Hunt, 413 U.S. at 743.

3          The fact that the principles taught in the secular workshops are consistent with Dr. Whiddon's

4  religious beliefs does not convert the secular mission into a religious one.  See Bowen, 487 U.S. at

5  621; Children's Healthcare Is a Legal Duty, Inc. v. Min De Parle, 212 F.3rd 1084, 1100 (8th Cir.

6  2000).

7          Plaintiffs contend that the federal grants fun afoul of the Establishment Clause in that the aid

8  supplants funding of services that it otherwise would have to provide through private sources.

9  Government aid to a pervasively sectarian institution does not impermissibly advance religion where

10  the aid supplements rather than supplants the institution's core funding.  Agostini, 521 U.S. at 226.

11  There is no factual basis for the argument that the grant funds supplanted other funding or services.

12  The grant funds did not free up any private funds that could be used for providing religious services.

13  Funding that supplements a sectarian organization's activities is that which adds a secular activity to

14  the agenda that did not exist prior to the funding.  This is what occurred.  The grants were used to

15  add capacity and provide entirely new services, the secular marriage education workshops.  The

16  remaining religious component, the news letter, is entirely funded by private donations.

17          Plaintiffs argue that the grant funds can be diverted to religious purposes and are therefore

18  unconstitutional.   In Mitchell v. Helms, 530 U.S. 793 (2000) a plurality of four Justices rejected this

19  contention, holding that government aid to a religious organization for permissible public purposes

20  doe not violate the Establishment Clause so long as the aid itself does not include religious content

21  and the eligibility for the aid is determined on a religiously neutral basis. Mitchell, 530 U.S. at 818-25,

22  829-32 (Thomas, J., plurality).  Justice O'Connor, joined by Justice Breyer, concurred in the result,

23  but indicated that they would hold such government aid impermissible if the plaintiff could show

24  actual diversion of the aid to religious purposes. )  Mitchell, 530 U.S. at 844-45 (O'Connor, J.,

25  concurring).  Here, the aid itself does not include religious content (Thomas) and there is no credible

26  ORDER - 13

1    evidence of actual diversion (O'Connor).

2         Plaintiffs final argument is that the grants constitute unmonitored grants to a religious

3    organization, and the amount of monitoring required to ensure public funds are not used for religious

4    purposes would excessively entangle the government with religion.  The Court is unpersuaded by this

5    argument.

6         There is no presumption that sectarian organizations receiving government aid require

7    pervasive monitoring.  See Mitchell, 530 U.S. at 861 (O'Connor, J., concurring).  The CCF grant

8    programs require the Marriage Institute of submit detailed applications on how it intends to use the

9    grant monies along with a budget outlining all anticipated expenses.  Federal regulations expressly

10   prohibit grant recipients from using public funds for religious activities.  Recipients must sign an

11   agreement which includes an assurance by the recipient that no funds will be used for religious

12   purposes.  Recipients are required to file financial status reports while the grant is ongoing and a final

13   performance report that details the project's accomplishments.  The government has the authority to

14   audit any program that receives public money at any time.  These monitoring requirements have been

15   found sufficient to satisfy constitutional safeguards and not result in excessive entanglement.  See,

16   Mitchell, 530 U.S. at 861-63 (O'Connor, J., concurring); Roemer, 426 U.S. at 734, 746; Bowen, 487

17   U.S. at 617; Hunt, 413 U.S. at 748.

18                                    **CONCLUSION**

19        Plaintiffs have failed to demonstrate either probable success on the merits or that serious

20   questions regarding the merits exist.  To the contrary, the Defendants have established that there are

21   no genuine issues of material fact that would support a finding that the grants to the Northwest

22   Marriage Institute violate the Establishment Clause.  There is no basis, in the law or the evidence, that

23   the federal grants have the 'effect' of advancing religion.

24        ACCORDINGLY,

25        IT IS HEREBY ORDERED:

26   ORDER - 14

1    (1)   Plaintiffs' Motion for Preliminary Injunction [Dkt. #35] is **DENIED**.

2    (2)   Defendant Michael O. Leavittt's Motion for Summary Judgment [Dkt. #57 ] is

3          **GRANTED**.

4    (3)   Defendant Northwest Marriage Institute's Motion to Dismiss [Dkt. #61] is

5          **GRANTED**.

6    (4)    Defendant Institute for Youth Development's Motion to Dismiss [Dkt. #63] is

7          **GRANTED**.

8    (5)   This action is **DISMISSED** in its entirety, with prejudice.

9

10

11   DATED this 20th day of March, 2007.

12

13

14

15   FRANKLIN D. BURGESS
16   UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26   ORDER - 15